The rules, one is we like you to adhere to the time limits for argument, so when the yellow light comes on at the podium, you have two minutes left, and when the red light comes on, we ask you to conclude your remarks unless you're answering a question from counsel. We are familiar with the briefs and record excerpts, but we have not necessarily read the entire record, so we appreciate record citations when those are appropriate. And with that, we will call the first case of the morning, number 23-20188, Keck v. Mix Creative. We'll hear first from Mr. Grimm. Your Honors, and may it please the Court, Andrew Grimm on behalf of Appellant Michelle Keck. I'd like to respectfully request four minutes for rebuttal. Your Honors, this series of cross-appeals involves four broad topics, and I'm happy to address any of them for which you have questions. First there's the issues of copyright fair use. Then there's the issues related to the trademark claims. Then there's the copyright fee-shifting collateral order, and then there's the issues raised in the cross-appeal. What was the last? The issues raised in the cross-appeal. I thought the district court was told that he didn't need to address the trademark. Well, I agree with that, that he did not need to address it because it wasn't raised in the summary judgment briefing. So I think the critical thing with respect to trademark, Your Honor, is that defendants moved for partial summary judgment. They didn't brief trademark at all. And so Rule 56A requires that a move-in under summary judgment advise the non-move-in as to what issues they're seeking summary judgment on, and they moved for partial summary judgment. Their briefing in summary judgment nowhere mentioned trademark whatsoever, so the defendants did not put Ms. Keck on notice of their intention to seek summary disposition. And this court has said it strictly enforces that notice requirement. Let me ask you, I mean, I think what Judge Smith is getting at is did your client waive it in the trial court when at the start of the hearing on summary judgment motion, counsel for defendants said he presumed that trademark and copyright were one and the same because the trademark was embedded in the copyrighted art? Record on appeal 2263. The court asked counsel for Keck, is that how you see it? Counsel replied, yes, Your Honor. Keck's counsel confirmed the court did not need to deal with something for the trademark. Yes, Your Honor, and I think there's a bit of ambiguity there. So they were at a motion hearing where the issue hadn't been raised, so the court didn't need to do anything for it. It was not a full summary judgment hearing. It was a partial summary judgment hearing. They are one and the same doesn't mean anything? Well, they're overlapping facts. So in the reply brief I cite, I believe it's the Nintendo decision which points out, yes, they're overlapping facts, but they're not overlapping legal claims. Well, go on with your argument. So I think the key point there, I would also note that if, so it wasn't briefed, but even if you think that it was, it was clearly decided erroneously because the incorrect legal standard was applied. The four copyright fair use factors don't apply in trademark and vice versa. They're completely different legal regimes with different standards. So in the very least, you would vacate because they didn't apply the correct legal standard. You'd reverse the standard and vacate as to the ultimate disposition. And respectively, the other side calls this gamesmanship, but it's not. Ms. Keck didn't have a chance to brief it. The district court didn't put her on notice. So if the district court intended to dispose of it, it could have notified her. It's, you know, ordered supplemental briefing. There's lots of procedural avenues that the district court could have taken to put her on notice. Instead, it summary disposed of it in a footnote that purported erroneously that copyright and trademark use the same fair use standards. They don't. Explain this term transformative as it applies to this case. You're claiming the use here was not transformative, is that right? Yes, Your Honor. All right. What does that mean? Explain to us how that term applies to the facts here. Well, I don't think it does apply. A few reasons. The Warhol decision from the Supreme Court last year is very clear. You have to have a laser focus on the specific use. The opinion uses the phrase specific use again and again and again. And I think it's so it's very important to emphasize the specific use here is in derivative work. She's making this kit. Michelle Keck has derivative rights under Section 106.2 of the Copyright Act. She can make a kit and sell it herself. She does that kind of thing. She sells merchandise. So transformative uses, typically speaking, are something where you'll look at the work and see that it's completely different. So I'll give you a pretty typical example that the Warhol decision gives is a book review. A book review, it takes the text and it targets the artistic expression or commentary. It's not trying to use it. It's trying to target or comment in some way. Another transformative fair use, it's in a tech situation, technology context, but the Google v. Oracle, when Google transitioned from a desktop-based API program into a mobile phone program, the Supreme Court held that that was transformative. And why isn't education similar to that? Well, I would say a few things because it goes back to the laser focus here on the use. Jacqueline Kienle is, she's not actually doing education with respect to what she's She's selling an educational product. Correct. In a for-profit rather than non-profit context, but it's not clear to me that that matters to the analysis. Well, I think that it does because she's not directly teaching. So the doctrines, as I understand the case law... So a school would have fair use, but a vendor to the school would not? That's correct. And that's how it works. How does the school get the materials? In other words, only if the school does it in-house, you can't... If it's directly in the act of teaching rather than selling, right? So if Amazon starts selling educational materials, they do sell educational materials, they still have to pay for the raw materials. Amazon violates copyright law, Amazon's school does not. That would be right. Well, and I don't even know that with the school... What's the best case for that? I think that... Corporate entity is what the theory of the analysis is. I think that... Normally it's the conduct that we look at, not the identity of the entity, is it? Correct. You're looking at what the specific use is. So take Warhol for example. That used to seem to be suggested last year, but that's not true here. Well, that's right because... So one thing I would say is she is selling them online. She doesn't... Jacqueline Kienle doesn't actually know what they're doing downstream with it. So for all... We have no idea that it's an educational purpose. Nothing in the record indicates she sold them online. So we don't know that it's an educational use. We know... She only sold six of them, which makes it even harder to say that we don't know whatever. Well, nothing turns... Your Honor, there's no limiting principle identified in the district court's opinion. If you reread the district court's opinion, imagine she sold a million. The nature of the use has not changed at all. The nature of the work has not changed at all. The quantity of the work, right, which is how much they copied of Michelle Keck's dogs, has not changed. And the market impact, of course, that has changed with the Fourth Amendment. Suppose this mixed creative has little classes for kids, and they put the Michelle Keck dog just like this in their class for kids, and they charge money for the classes. Would that be a copyright violation also? I don't... I think that would be totally different. Michelle didn't... The only difference is that you're having mom at home do the instruction through the, you know, purchasing the kit, instead of the ladies at mixed creative doing it in their classroom and charging money for it. Well, what I would say is that is a big distinction. So go to the Warhol decision. So in Warhol, Andy Warhol made the painting. Well, it looked like... Frankly, Warhol looks like an easy case with a huge amount of dicta associated with it. But that's just my... I mean, you know, so they sent that back. But, you know, they were both... Warhol took the picture, made a silkscreen, and then used it for exactly the same purpose that the original picture, photograph, had been used for. Over and over. They both did it. Over and over. Well, I think, Your Honor, I'd turn to the derivative right. Congress gave Michelle Keck derivative rights, and all artists derivative rights. And that means she could enter this merchandising market as well. And she, in fact, does enter the merchandising market. She does license to teachers. So the difference is it's a property right. So you might not think... Let's take an example of someone crossing your lawn. You might not think that's a big deal. Michelle Keck's lived experience is thousands of people online are infringing her left and right. And so if a thousand people are crossing your lawn every day, all of a sudden it adds up. And that's the wisdom of the Supreme Court's emphasis that on the fourth factor. But Your Honor, I would turn your attention to what the Supreme Court said in Campbell. And it says, quote, it is impossible to deal with the fourth factor except by recognizing that a silent record on an important factor bearing on fair use disentitled the proponent of the defense, the defendant, to summary judgment. They presented no evidence whatsoever on their affirmative defense. And the clear language of Campbell says that disentitles them to summary judgment. So the Campbell Court, even there where it was transformative, the parody was... That's the primary holding. They send it back because they want to know the market impact. The only evidence we have in the record is that there is a market for these derivative works. They can be sold. And so one difference between the teacher and the classroom example is, first of all, the teacher's... Where did the teacher obtain it? If the teacher buys it from Michelle Keck, that's not even an infringement because to know if it's an infringement, you have to go through the one of six rights. And then let's say that... So, well, the...  So you have to go actually make a copy. So if I purchase an infringing product, that's not an infringement at all whatsoever. It would have... So you have to... Undertaking one of those acts. And... What is the relief that you're ultimately seeking in this case? That my... Like what remedy? What relief have you pleaded for? Well, I mean, the council below pleaded for six cases of willful infringement, but I would point out that willful infringement damages. So willful increases the upper limit on statutory damages to $150,000, but the minimum stays the same at $750,000. So what the main factor on willfulness is that in a long drawn out, if a defendant fights really hard on a clear infringement, it allows them to move for... It helps their motion for attorney's fees if they later prevail. But Michelle Keck, her primary reason is that she doesn't want people using her work. Money is not at all the issue for her. She's upset that... Look, Jacqueline Kienle is all over her page. She has a licensing page. She doesn't even get asked as a common courtesy. Michelle Keck has had dozens of teachers come and say, can you use it? She's given it to every single one. She's said, sure, you can use it for free. She's given it to them. The issue is Jacqueline Kienle doesn't even bother. Supposedly infringing kits were removed from the market immediately. And if you affirm they could go right back... Why is she complaining if that's her issue? Well, first of all, when you file the suit, the infringers don't tell you up front. She's been infringed thousands of times. They don't tell you how many they've sold, so she only learned in discovery. And what I would tell you, nothing in the record shows that Jacqueline Kienle was going to stop. She was going to keep selling them until she got caught. No, it's she took them down when she got served a cease and desist. But just, do I understand what you said moments ago, if the defendant had simply asked nicely, we wouldn't be here? I think if they, they probably would have come to an agreement on a profit-sharing arrangement. So yes, if they had contacted her, I don't think we'd be here. Said, okay, share some... Okay, maybe I misunderstood what you said earlier. I thought you had said teachers all the time contact your... Yeah, teachers do. And she does give it for classroom uses and direct educational uses. Yes. But I think my understanding is what... I see. Your point is she... I'm just trying to understand your client's position. If it's a teacher, that's one thing. If it's a business like this, it's a different answer. Is that your point? Yeah. She would want to cut the profits. I mean, if someone... Because if you sell a million of these things, remember, there are thousands of people infringing her. So the district court emphasized $240. I'd point out, fair use doesn't turn on the volume because you're a court of appeals. I understand that. But what you said at the beginning was she didn't know how many had been sold. Correct. She finds out six, then according to you, the artist says, I don't really care. I want these to be used for teaching purposes. So six were on the market, six went off the market. Why are you here? Well, oh, because of it's the whack-a-mole problem. This is well known in copyright. So people take it down, they'll show up on a different website the next day. You have to remember... Do you have any reason to think that Mixed Creative is going to put this on another website? She has every reason because you're not taking seriously... Thousands of people infringe Michelle Keck's work. Seriously, I'm not exaggerating. Thousands of people infringe Michelle Keck's work. She'll take... How many lawsuits has she filed? I don't know the answer to that. It would be very small. She tries to send as many takedown notices as she can. But she'll send a takedown notice, it'll be up on the next website the next day. So what you're going for is the principle. This is not a money case. This is an established principle that you could use in the future. That's correct. And if you affirm Jacqueline Kienle could start her business tomorrow, there's no limiting principle and she could sell a million. That's the implications of affirmance. You'd be destroying the market for derivative works. What's your best case for the proposition that this is outside fair use? Sorry, my best case? My best case for the proposition that this particular kind of use is outside of fair use. Oh, well, I think, I mean, so I think there's, I would say Harper is, Harper emphasizes the derivative right. So in Harper, someone took 300 words out of Gerald Ford's memoir, just 300 words, not a fair use. And the court emphasized the derivative right and how essential that is. And then I think the other best case is Campbell, because there's no evidence that they've put forth about limiting market harm. All right, so thank you. You have time for rebuttal, Mr. Garcia. May it please the Court, Roland Garcia here with my colleague, Mark Kretien, we represent Mixed Creative and Ms. Kienle, the owner of Mixed Creative, the underlying defendants in the application. Do you want to speak into the microphone, please? Yes, Your Honor. My apologies. Thank you. Thank you. I think what's, what counsel has missed in this, and in fact, when the Warhol case came out, the U.S. Supreme Court Warhol case, it's now a new, a new approach to fair use analysis in the Fifth Circuit. The prior cases had a different approach. It's now really a multi, a three-part test. And the question was asked, well, why is this transformative or maybe not transformative? And we are instructed by Warhol. Warhol says that the first thing you look at is the purpose and character of the use. They call that the substitution test, basically. Does this work, for example, the defendant's work actually substitute for Ms. Keck's commercial art? The answer is clearly no. And the way you look at that is to say, well, it's a matter of degree. You look at, does it add a different purpose, a different character? Does it add additional information? Is it commentary? Is it parody? Is it teaching? Is it all these other things that are different than the purpose of the original art that you would hang on your wall? No one would buy an art kit, an eight and a half by 11 piece of paper that just had examples of decoupage art for the purpose of teaching young children art styles, art history, about artists from around the world and different parts of the country. Ms. Keneally, the defendant, had been doing that for 20 years without objection from any artist for the clear purpose of teaching children about art styles. Our position is very clear, Your Honors. There is no way you can effectively teach an art style without showing the art style. You could tell a young student, eight, nine years old, about decoupage art or about pastel arts with Mozart or other artists, but until you show the art, it's hard to grasp that  When opposing counsel asked what the best case was for this being outside fair use, I believe he said Harper and Campbell. I think the response is that those are no longer good law. Campbell's good law. In fact, Campbell I thought your theory was that Warhol overhauled the law. Warhol expanded upon Campbell You're saying even without Warhol, Campbell and Harper don't help them. Why not? I'm not, I would, I'd say there are some underlying Fifth Circuit cases that didn't apply this test that Warhol has applied is what I was trying to suggest, Your Honor. And, which is what the district court here was applying. Like for example, in the first factor, the fair use first factor, which is the purpose and character, the district court said one of the elements was good faith to look at that. That's a subjective concept. That's no longer in the test under the pronouncements of Warhol. We think also, and I will disagree with my colleague. He thought that the Campbell case supported their position. Actually the Campbell case, Judge DeSouter's decision, supports our position almost perfectly. And in there, the song by Two Live Crew was in fact a parody of the original Pretty Woman Orbison's song. And what Two Live Crew did was they took that song, they made a parody out of it. And what the court says in Campbell is that it added something different. It was a different market. It was, it was commenting on, it was a parody. And to be able to do a parody, you have to use the original to do the parody. Here we were teaching about decoupage style of art, which is the collage pieces . . .  How is it said? I call it decapage. Maybe I'm wrong. I think you're probably right, Judge. I'm a lawyer, not an artist, but I . . . Me neither. And, but it's a particular style of art. It's hard to just say the word to an eight or nine-year-old without showing them the picture. Also, there's a whole line of cases where you have biographical information that's part of your teaching or your study that is also transformative. Those cases were basically ignored by the other side. And so, we say that for a lot of reasons, that this particular art, it actually was an image pulled down from the internet that is not clearly a substitute for the original Keck art. We think that the second question under the fair use first factor is, is there justification for it? You need to have a justification. Does it comment on? Does it criticize? Does it provide otherwise different information? Here, it fits perfectly within that test under Warhol that, yes, it does provide additional information. Teaching information, historical information, biographical information, art styles. The kit wasn't just selling Ms. Keck's art. It had paintbrushes and paints and information and a whole package to where the goal was to teach the young student about this art style and to create their own masterpiece in that style. Let me ask you about the first statutory factor. Yes, Your Honor. It's the purpose, what determines fair use. The purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes. I suppose this is sort of both, right? This is educational, but it's also commercial, not non-profit. What do we do with that? This is one area where the district court actually got that wrong, even though it came to the right result. The analysis was not quite in line with Warhol. Warhol says that, yes, you do look at commercialism, but that's only in the context of what is the purpose and nature of the use. You look at factor one, the purpose and nature, and that aligns also with factor four, which is the displacing of the market. When it's a distinct purpose, a different purpose, it's adding more, it necessarily does not replace the market for the original. Now, your question is a good one, Judge Ho, and that is, does it matter if, let's just say hypothetically, Ms. Keneally's art shop was a non-profit organization rather than a for-profit organization. It has no bearing. That shouldn't matter one ever. Well, except that the statute seems to suggest it has a purpose. It suggests it's a consideration. It's a non-profit. It appears to be a dichotomy that the Congress is setting up. How Warhol has interpreted that is to say, yes, you consider it as within the context of the nature and the purpose, and that's why the Warhol court applied that two-part test of, is it a substituting of the work, whether you're a for-profit hospital or a non-profit hospital, you know, what are you doing? And then... You're saying this language is more about market analysis rather than pro bono or for-profit. I would say it's about the market substitution is, I think, how Warhol had put it, which I think Warhol was, that assessment makes sense. You're essentially saying, you're saying the two parties are not in competition. These are, if anything, they're complementary. Yes, Your Honor. Well, they fit together based on the facts. In fact, the third factor also fits together with the first factor according to Campbell and Warhol. And so we believe the Campbell case is probably right on all fours with this situation here, which is, yes, you take the original work, but if you do something different with it and you don't, your use is distinct and different, like a teaching tool, for example, and, you know, no one's going to take the Keck art, Keck, I mean, the defendant's art kit and put that on the wall. It would have pictures, it's got biographical information, it's got a picture of the artist. It's not a substitute for commercial art that you would hang. So we believe that that is a, that those issues are in favor of . . . Why, just to play this out, why couldn't you do that? Why couldn't you purchase your client's former product and instead of teaching it to kids, you frame it and put it on your wall? Is it the wrong size? Is it a different quality? It's a much smaller size. It's, well, on the Record on Appeal, page 1167 is a good example of it. It's a picture like this, which I'm holding in my hand, and Ms. Keck actually sells this piece of dog art here, and she sells this piece of dog art here, and this piece of dog art here, and this one here. This was just using little, small little images, little pieces. Your point, this would be useless as an artistic . . . It's useless to hang on the wall. I guess you could hang it on the wall, but it's not a substitute for the commercial art that you would sell at a high price that you would put in a gallery. This is clearly a teaching tool, and it's got biographical information, a picture of the artist. So it's a different market, so to speak, is the way it was discussed in the Campbell case as well as in the Warhol case, Your Honors. Is it established . . . Pardon my ignorance. You, I'm sure, know the area a lot better than me. If you had a book, an art book, a book that simply provided pictures of different kinds of art, would that be, obviously, fair use, or is that an open question? In general, it could be fair use, and there are a lot of cases that say that's fair use. It kind of looks at the extent, and it goes through all those four factors, and is it somehow replacing? Mr. Graham brought up the point about derivative rights. Well, in no way, shape, or form in this record has no evidence whatsoever that these six art kits somehow negatively impacted the derivative markets or market rights of Ms. Keck. And I want to mention something else, which I think was brought up by this Court, is that well, you know, if you would just have asked for permission or whatever, keep in mind that Ms. . . . the evidence in this case is undisputed of what the industry standard is in terms of teaching art and art styles, and Ms. Keneally had been doing it this way for going on twenty years without complaint. And one of the arguments raised by the plaintiff in their briefing was that, well, you should have used a work that was just not copyrighted. Well, Your Honors, we submit that that argument is contrary to the Section 107 of the Copyright Act, which is the Copyright Act actually promotes the progress of science and arts without diminishing the incentive to create, and there's nothing in the Copyright Act that says, well, if you're going to do a transformative piece or a period or whatever, that just go do it on something that's not copyrighted. I mean, that makes, you know, then the law protects the copyright totally and there's no defense at all. Exactly, Your Honor. So, that means they could all do Mona Lisa. I'm sorry, Your Honor? I say the kids could all do Mona Lisa. They could all do Da Vinci, but they couldn't do Edward Hopper or Andy Warhol or any contemporary artist, I suppose. Would depend on the nature of what they're doing? It would depend on if it's . . . Which part of the, you said the district court erred slightly in one of these elements, and is that the one, the first consideration is . . . There was a reference in the first factor to considering that, first off, the district court gave kind of an outsized approach to that. If there's a commercial nature, then that's presumptively not fair use. That's not the law anymore, or if it ever was, under Warhol, and then the court then talked about, well, then we also look at the nature and purpose, and then thirdly, look at good faith. Actually, the good faith facts support us, but the point is, that's not part of the analysis in Warhol. We think that was . . . The district court erroneously got to the right place, but that was really not the part of the first factor. Well, doesn't this express it right, though? It says the first consideration is commercial nature, quote, the crux of the profit-nonprofit distinction is not whether the sole use is monetary gain, but whether the user stands to profit from exploitation without . . . You're saying that's quoting Harper and Rowe? Yes, Your Honor. But Warhol changed that? Warhol clarified . . . Clarified, okay. . . . that quite a bit, actually, on looking at the justification issue, looking at the distinction issue, and how commercial nature is part of that, but kind of almost as a secondary piece to it. I did want to point out that there's a lot of argument here that we've heard, and in the briefing, and, oh, she was making a profit. Actually, Your Honor, in the submission of the evidence, and there was never any controverting evidence, the defendant proved she never earned a profit, ever, in her entire 20 years. She does this for the love of teaching, wanting to help disadvantaged kids. This was during the COVID pandemic, and trying to sell kits, and doing the classes online, and again, she only sold six kits, two of them, to the plaintiff herself. This was at the Record of Appeal on page 991 to 992, a very detailed affidavit. There was some discussion earlier we heard from opposing counsel about, well, we don't know what she did, and how many, and this and that. Detail laid out exactly how she teaches, what happened here. She stopped selling. She's not going to sell them anymore. Your brief says that they could claim as much as $900,000 here. Absolutely, Your Honor. Plus attorney's fees? Plus attorney's fees on a $240 case, actually a $160 case because two of the kits were purchased by the plaintiff herself. We think that shows, frankly, and that ties into my last issue, and I have just a couple of minutes here, and that is that we think the district court was wrong on failing to award attorney's fees under 28 U.S.C. 1927. When a lawyer knows that he or she is prosecuting a case relentlessly seeking willful infringement damages in this copyright context, knowing there is absolutely no evidence of willful misconduct, it's wrongful, and what the district court said was, and the district court even made a finding of improper motive under Section 504 for attorney's fees against the plaintiff, but when it came to the lawyer, the district court judge said, well, but there's no bad faith shown by the lawyer. Well, it's completely bad faith, Your Honor, and we think that, frankly, what this court ought to clarify, when a claim is brought, an argument is brought under Section 1927, we shouldn't even have to look at is it bad faith, is it not. Those are subjective standards. We think it should be entirely objective and that here when the plaintiff brings a case knowing there is no, and this is part of a, this is used as a weapon in the copyright industry over and over and over again. There are firms that specialize and do nothing but this. They send these demand letters. I'm sorry, go ahead. In this case, trial counsel was Bradley A. Rant, right? Excuse me? Bradley A. Rant, Bolt Cummings firm, were they the trial counsel? No, it was Matthew Higbee was the underlying. Oh, I see. Santa Ana, California. Okay. Yes. Mr. Higbee, and it's in the record. We did a search. It's part of the motion for fees. He's brought hundreds of these cases in the last several years and it's actually . . . All from Ms. Keck or for other people? Against other people. I'm talking about in pace for hundreds of cases against many defendants and Ms. Keneally was just one of them. And the business model is this, they send you the demand letter, they say willful infringement, that make you pay tens of thousands of dollars. If you don't, you might have used one photo or whatever by accident and in this case, the evidence was very clear. Ms. Keneally had no reason to know that the work was copyrighted. It didn't have a copyright symbol on it. She just pulled that image down from the website. She taught this way, it's part of the industry in teaching this way, and she'd never had a complaint before. She's never been trained in copyright law and so we . . . and there was . . . the statutory scheme makes very clear there's what we call infringement under 504, there's what's called innocent infringement under 504 when you're just not aware that your use was an infringement, and then there's what's called willful infringement. It's a statutory scheme. Congress was very clear. Mr. Higbee knows well the difference between a willful infringement, a regular infringement and an innocent infringement. The facts all here pointed to innocent infringement and our view is that this is the perfect case for this court to clarify what is the standard for vexatious conduct? What is the standard for unreasonably pursuing a case when there's absolutely no evidence of that case? We think there are cases out there like the Hacienda Records case and other cases where if you're just prosecuting a case with no . . . that ought to qualify for a vexatious conduct, unreasonable vexatious conduct, and we should have been awarded attorney's fees against the counsel as well. Thank you, Your Honors. All right, sir. Thank you. Okay, Mr. Grimm-Rebuttal. So, what about this makes it willful? Oh, well, my opposing counsel is misrepresenting the record. She went . . . Jacqueline Kienle went to Michelle Keck's website. All over her website, there's a licensing page, a please contact me, that talks about her . . . So, she says, Jacqueline Kienle's own words are, I went all over that website and I researched her left and right, and that website will tell you Michelle Keck's the copyright owner, she will license it, please contact her, and she didn't . . . and Jacqueline Kienle didn't do any of that. Your Honors, I would point out that the demand . . . the demand here was, as discussed in the cross-appeal reply brief, was $7,500 per work, and that also accounts for what the trial counsel attorney fees would be there. Judge Jones, you made a point about Van Gogh, but actually, there'd be a lot more than Van  There's an institution called Creative Commons. Creative Commons allows free online works. The Brammer decision from the Fourth Circuit in 2019 talks about how if you have millions of other options. So, Kienle searched for pictures of dogs. That's in their brief. Pictures of dogs is what she searched for. She had millions of other options. If she wanted . . . and for free. So, you go to Creative Commons, search for dogs. You'll see cartoon dogs, you'll see all kinds of free images that are available. But she went to a website and she disregarded the license, disregarded the copyright. As to Judge Smith, as to transformative VR use, Warhol talks about that a lot, and it emphasizes what it calls targeting, meaning it's commenting on the work. This art kit has no direct commentary. When she makes it, it doesn't comment on the dog itself. So, for example, they said Andy Warhol didn't make a transformative VR use because he wasn't commenting on Lynn Goldsmith's photo. There's no commentary on the dog itself. Rather, they're making what's called a derivative work. So please read section 106.2, which talks about her derivative rights. That's emphasized in Warhol. So take Mickey Mouse. It was a cartoon. Now, there's a lot of derivative movies. There's also derivative merchandising. That's how they're able to build a business. That's an artist. They do it at a much smaller scale. That's how they have a livelihood. Also under section 107.4 of the Fair Use, my opposing counsel is forgetting potential markets. It's in the text of the statute. And when they say it might help Michelle, it's not going to help Michelle, but it's certainly going to reduce the value of her copyrighted work. What would you say about an art history or art techniques book that showed a number of different pieces of art, including this type of art? Judge Ho, absolutely a Fair Use. That would be a Fair Use. That would be a Fair Use because it's commenting on the art itself. It's talking about the techniques of the art, just like a book review is talking about the book. If you look at these art kits, they're not saying anything. They're talking about Michelle Keck. They're not talking about her art specifically, not commenting on her art. And Jacqueline Kienle herself isn't commenting on it. She's putting them online for sale. My opposing counsel is fundamentally misrepresenting the case. What he'll admit is that in 2020, she went from an in-person to an online system. We would have no objection whatsoever to an in-person teaching. What makes the book, though? You're assuming that the book has commentary. What if a book is simply a book of pictures? A collection. Well, if it's simply a collection of pictures, I think they'll go back to Warhol. It needs to comment or there needs to be some other profound justification. So if it's a historical artifact, let's say, I think that goes to The Grateful Dead. If you're making a documentary on The Grateful Dead and you're commenting on The Grateful Dead in a post-artistic way, there could be, but I think that would be a much harder case and it would depend on other, I think it would depend more on the other factors like the second and the third factors. So an example would be like news reporting. If you had a book of newspaper articles and you're collating those, those are factual works as opposed to artistic works. Don't forget the second and third factors, even the district court admits, they weigh decisively in my client's favor. So then we get to the fourth factor. My opposing counsel says no evidence whatsoever. That hurts him. It's his affirmative defense to show evidence. And Campbell expressly says, even though it's transformative, we're remanding because there needs to be evidence of a limited market impact. We shouldn't be hypothesizing it's making it up. It needs to be a factual record. Let me, let me just ask you, um, why shouldn't fees be imposed on Higbee under 1927? Well I think, I, I might. Or Rule 11 for that matter. Well, Rule 11, I mean Rule 11, they didn't file a Rule 11 motion, um, as to 1927. But we meet them as alternatives all the time. Um, well it wasn't raised below, so party presentation, I'm not sure if they even served one, it's. Okay, well, we're going to go to 1927. Um, sure Judge Jones. I guess I would point out that, um, the main thing I would say is, so, look, on willfulness, I do think if someone's looking at your copyrighted website, seeing your logo, researching your website, ignoring your license page, you're at least reckless. You may disagree with that, but that's one issue in the case. They might have, they might have filed suit in good faith. But to carry it through like this, when you found that there's a total of six, there's no obvious evidence of willfulness on the part of the defendants. There's no exposure to, no realistic exposure to $900,000. Well they didn't . . . What makes that not vexatious? I mean, I'll bet today, if they offered $100,000, your client would settle. But I think, I think that it, is this, this to me seems to be guided by an aggressive, a super aggressive lawyer, rather than the plaintiff really making a principle. Um, well, so I guess I'm a non-profit lawyer, so I wouldn't, I wouldn't call myself a super aggressive. Um, I guess what I would say is, because if, if you don't plead something, um, if he hadn't, so remember, a fact finder finds the willfulness. So do I think realistically that there's any possibility a jury or a bench trial, they'd award a large amount, sum of money? No, I don't. Um, so if you say willfulness, all that does is increase the maximum, it doesn't increase the $750,000. Well, it increases settlement demand, which is what happened here. Well, I mean, um, I don't know that it increases the settlement demand. I mean, Michele, Michele, the big break, the big barrier to settlement in this case was that Jacqueline Kienle, um, she's the daughter of a very prominent woman who was demanding a non-disparagement clause, and, um, and Michele Keck viewed that as an attack on her free speech rights. Um, so Jacqueline, and, and so that was the barrier. They offered $20,000 and Michele would have accepted far lower than that, it really wasn't about money. If you, if you look through the record, it's pretty clear she didn't, Michele was really upset because what happened is, um, they offered $20,000, they didn't, they took a long time to write the contract, they never, she wanted to accept it, but they have a non-disparagement. If you, if you're, if you represent ordinary individuals, they view that as a big attack on their free speech rights, and especially she's the daughter of a very prominent politician, so she didn't want a non-disparagement clause, the, her monetary number was far lower. She just wanted an agreement, what she fundamentally wanted was an agreement of cessation, because you have to remember, I'm not exaggerating, she is infringed on by thousands of people, and so, and what'll happen, she'll send a, she'll send the takedown notice under 512, it'll be up on a different website the next day. Okay. Thank you. Thank you, Your Honors.